**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| HARRY L. BECKETT, | |
| Plaintiff, | CIVIL ACTION NO. 1:18-cv-00329 |
| v. | (SAPORITO, J.) |
| U.M. GRANT, *et al.*, | |
| Defendants. | |

# MEMORANDUM

Harry L. Beckett, currently incarcerated at SCI-Dallas, alleges that ten defendants affiliated with the Pennsylvania Department of Corrections ("DOC") have failed to properly accommodate his medical conditions. The defendants have moved for summary judgment. The record does not show that any defendant was deliberately indifferent to a substantial risk of serious harm, nor that Beckett was subjected to a retaliatory prison transfer for complaining about these accommodations. Accordingly, we will grant summary judgment to the defendants.

## I. BACKGROUND

Beckett's claims concern what he describes as "longstanding and historic disabilities" that cause pain and sensitivity to cold weather, among other symptoms. In brief summary, the operative complaint (Doc.

22) alleges as follows:

At an unspecified time, Beckett received a "medical based transfer" from SCI-Huntingdon to SCI-Smithfield. At SCI-Smithfield, Beckett claims that prison staff made "comments like": "This is not Huntingdon. This is Smithfield. We still run it" and "He thinks he's special! We'll show him." After the transfer, Beckett filed a grievance about the way meals and medications were delivered to his unit. Beckett contends that he was then transferred to SCI-Laurel Highlands in retaliation for this grievance.

At SCI-Laurel Highlands, Beckett made requests to defendant Unit Manager Grant to "return from P.M. yard at 'half-time movement' to relieve . . . some of the increased pain." We infer that Beckett wanted the option of a shorter than normal period of yard time on cold days, but prison rules required that he enter and leave the yard at a specified time. Grant denied this request on the basis that Beckett could ask staff about the weather and decide each day whether he could tolerate going to the yard. In addition to the yard issue, "access to the Law Library was over [four] football fields away, and church was outside," thus further exposing Beckett to "inclement weather" while he was at SCI-Laurel Highlands.

In general, Beckett alleges that various defendants, including nurse Mrs. Schrock, counselor Mr. Wilson, and medical directors Dr. Dancha and Dr. Mihaly, "den[ied] expressed concerns" relating to his "Z-Code" status[1] and medical care, including his sensitivity to cold. He requests monetary damages and a variety of injunctive relief, including permanent Z-Code status in a warm cell or a cell outfitted with a space heater; that he be transferred back to SCI-Smithfield in a van that is not "crow[d]ed and noisy"; and that he have access to winter clothes, "walking cane, cervical neck collar, etc. as needed."

On October 2, 2019, the operative complaint was dismissed with prejudice, but Beckett appealed. *See* (Docs. 54, 55, 57). On February 17, 2022, the United States Court of Appeals for the Third Circuit vacated the judgment in part and remanded for further proceedings. Specifically, the court found that Beckett had adequately alleged Eighth Amendment claims based on (1) his exposure to cold temperatures; (2) the revocation of his Z-Code status; and (3) the failure to provide other accommodations

---

[1] Within the Pennsylvania Department of Corrections, Z-Code status refers to prisoners who are required to have a single cell without a cellmate. *See* DC-ADM 802; *DeFranco v. Wolfe*, 387 F. App'x 147 (3d Cir. 2010).

for what Beckett described as "conditions related to his 'neurological, muscular and skeleton systems'." Further, Beckett had plausibly alleged that he was transferred to a prison that offered inferior medical care because he filed grievances about his conditions of confinement and medical care. *See* (Doc. 68-2). Although the Third Circuit did not specify the appropriate defendants for these claims, this Court has construed the complaint as naming ten viable defendants: Dancha and Mihaly (the "Medical Defendants"), and Bubb, Grant, Kowalewski, Price, Savino, Schrock, Silvia, "Unit Manager B Block," and Wilson (the "Commonwealth Defendants"). *See* (Doc. 80 at 2, n.2).

Following several extensions of time granted to the parties, and a stay of the case following the bankruptcy of the prisons' private medical provider, defendants have moved for summary judgment (Docs. 93, 146, 149)[2], and the motions are ripe for resolution.

## II. LEGAL STANDARDS

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any

[2] The Medical Defendants filed what appear to be two identical versions of their summary judgment motion; the latter motion will be denied as moot.

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251-52.

In evaluating a motion for summary judgment, the Court must first determine if the moving party has made a *prima facie* showing that it is

entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Only once that prima facie showing has been made does the burden shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Both parties may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A).

## III. MATERIAL FACTS

Beckett's responses to the motions do not comply with the local rules of this district, because he has not directly responded to defendants' statements of material facts. *See* M.D. Pa. L.R. 56.1. Nonetheless, we have considered all the evidence and argument that Beckett has submitted.[3] *See* Fed. R. Civ. P. 56(c)(3). Where Beckett has not presented competent evidence to dispute defendants' statements of fact, those facts

[3] Beckett's filings are written in a verbose, stream-of-consciousness style that is occasionally difficult to understand, but we have "liberally construed" his allegations and arguments. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

are deemed undisputed. *See* Fed. R. Civ. P. 56(e)(2).

**A. Medical Conditions**

Beckett has been in DOC custody since at least 1999. He has a variety of medical conditions stemming from injuries sustained prior to incarceration, including reflex sympathetic dystrophy ("RSD")[4]; a separate nervous system disorder that causes "intermittent and precipitous bouts" of weakness in situations of "physical or psychological stress"; cervical radiculopathy causing weakness in his shoulders and arms; "major neurocognitive disorder due to traumatic brain injury"; and post-traumatic stress disorder. *See*, *e.g.*, (Doc. 96-1 at 5-6; Doc. 147-5 at 16-18; Doc. 147-7 at 24; Doc. 147-8 at 12; Doc. 154-8).[5]

---

[4] RSD, also known as complex regional pain syndrome ("CRPS"), "is a form of chronic pain that usually affects an arm or a leg . . . The pain is out of proportion to the severity of the initial injury." *See* https://www.mayoclinic.org/diseases-conditions/crps-complex-regional-pain-syndrome/symptoms-causes/syc-20371151 (last visited Sep. 15, 2026).

[5] The defendants have collectively submitted thousands of pages of medical records and other records documenting the medical care and accommodations Beckett has received within the DOC. *See generally* (Docs. 96, 147, and attachments). We have summarized the material facts, but we do not purport to identify every medical fact that is relevant to Beckett's claims.

**B. SCI-Smithfield (January 15, 2015 – August 18, 2016)**

On January 15, 2015, Beckett was transferred from SCI-Huntingdon to SCI-Smithfield, where he was cleared for placement in the general population. (Doc. 96-1 at 1299). According to a grievance response prepared by a deputy superintendent, Beckett's transfer was "initiated by SCI Huntingdon staff" as part of a "swap" of inmates between the two facilities. However, for reasons not explained in the response, SCI-Smithfield staff were not made "aware of any medical concerns or accommodations prior to his arrival." (Doc. 147-7 at 20). Beckett contends that this transfer was directed by several defendants in retaliation for his filing grievances. He has presented a notarized affidavit from another inmate, Bruce Cooper, who was incarcerated on the same block as Beckett at SCI-Huntingdon. Cooper attests that after Beckett's transfer, defendants Bubb and Savino made the following comments when Cooper would "ask about [Beckett]": "For now, he's good! In time, we'll have our day. He's not at Huntingdon. We run Smithfield!" (Doc. 170-18).

The day after the transfer, January 16, 2015, medical staff were summoned for an incident in which Beckett complained of "having trouble standing." He was observed "slowly 'falling' – lowering himself to

the ground." He was taken to the infirmary, where the nursing staff noted that he generally refused to respond or cooperate with treatment.[6] Eventually, Beckett told them that he was "unable to ambulate outside" because of sensitivity to cold weather. (Doc. 96-1 at 1297-98, 1318-19). Beckett remained in the infirmary through January 21, when he was discharged with instructions that his meals and medication be delivered to him. (*Id.* at 1229). On March 25, after further examination by a neurologist, he was moved to the Special Needs Unit at SCI-Smithfield, where he remained through August 18, 2016. *See* (Doc. 96-1 at 1192-1202, 1286; Doc. 96-3).

On July 29, 2016, security staff advised a nurse that Beckett was working in the chapel and was walking there twice per day. The nurse questioned the "rationale" for Beckett having his medications and meals delivered. On August 2, Dr. James Frommer suspended the delivery of Beckett's meals and medications to "begin to allow [Beckett] to go to the chow hall . . . and [pick up]" his prescriptions. Medical staff would

[6] For example, Beckett was observed to open his eyes when staff were entering the room, but "hold[ ] his eyes shut" when they approached to examine or treat him. *See* (Doc. 96-1 at 1297).

monitor the situation as the weather got colder, and the matter would be reassessed in no more than 90 days. (Doc. 96-1 at 1276).

Later that day, Beckett complained to his superintendent and unit manager about the termination of his meal and medication delivery. He asserted that the delivery was necessary for him to "avoid as much cool, damp[,] rainy, outside exposure, etc . . . [and the] cool/cold dining hall and having to stand for long periods of time." He alleged that the accommodation was revoked due to "mean-spirit[ed]/negative influences," and requested "a medical and/or mental health transfer" to an unspecified facility. (Doc. 96-8 at 28). On August 4, he filled out a written Disability Accommodation Request Form, wherein he also requested transfer to an "SNU or medical unit." (Doc. 96-6 at 14). After further evaluation of Beckett, the medical staff confirmed that he was still having difficulty with activities of daily living and "walking distances" due to his RSD and cold sensitivity. Medical administrator William Dreibelbis wrote:

> With inmate Beckett's condition worsening he will soon need to be housed in the Infirmary area due [to] his need with more assistance to do the activities of daily living. It is Dr. Frommer's opinion that Inmate Beckett be transferred to a personal care setting such as Laurel Highlands or other personal care setting.

(Doc. 96-1 at 987); *see also* (*id.* at 1062-64). In response to Beckett's grievance, a nursing supervisor explained as follows:

> The housing officers did contact the medical department as they had noticed that you were not following the medical restrictions provided to you by the medical staff. You were freely walking to the chapel and missing the morning medications that medical was delivering. When you were walking to the chapel area due to the warm temperatures in the summertime you were not wearing extra clothing that were accommodated for you by medical. The block officers were verifying if the medical restriction to have your medications delivered was still being followed by all parties. As your medical condition makes it difficult for you to function in cold weather, Dr. Frommer was consulted and he felt that during the warm months you would benefit from being able to freely walk to the pharmacy to pick up your med[s] and when the weather began to get cold again he would have your meds delivered again. After this change was made you notified CHCA Dreibelbis that you were still having difficulty being able to walk around the compound and needed further accommodations. CHCA Dreibelbis placed an ADA accommodation recommendation to the Bureau of Health Care Services. The recommendation was reviewed and you were recommended for transfer to Laurel Highlands for better accommodations for your medical condition.

(Doc. 96-6 at 5-6). Beckett had retained Z-Code (no cellmate) status "since 1993" (Doc. 147-7 at 6), but this status was revoked on the basis that it would "facilitate [his] transfer" to SCI-Laurel Highlands. Although various records indicate that his Z-Code was cancelled for this purpose,

it is unclear why SCI-Laurel Highlands could not or would not accommodate Z-Code status. *See* (Doc. 96-6 at 11; Doc. 96-8 at 6; Doc. 147-7 at 6-7).

**C. SCI-Laurel Highlands (August 18, 2016 – March 16, 2017)**

At SCI-Laurel Highlands, Beckett was held in a long-term care unit. (Doc. 96-1 at 1275). Nursing staff documented that Beckett could walk short distances with a cane but required a wheelchair to travel longer distances. He was generally able to perform activities of daily living independently. *See*, *e.g.*, (*id.* at 1075-1083, 1269-1279).

On September 9, 2016, Beckett filed a grievance seeking the restoration of his Z-Code status. He referred to a letter sent by James W. Broatch, a representative of a CRPS advocacy group, to Beckett's unit manager, defendant Grant. In this letter, Broatch stated that Beckett "has lived in a single unit for decades because he does not have a spleen. Furthermore, individuals with CRPS have a compromised immune system and are more prone to infections and communicative diseases. It is imperative that [Beckett's] "Z-Code" status be reinstated ASAP." *See* (Doc. 96-8 at 6, 22). The grievance was denied on the basis that the medical staff's own review indicated no need for a single cell based on

CRPS or a splenectomy. Further, there would be no basis for a single cell based on Beckett's sensitivity to cold, because the temperatures in the single cells were not separately controlled, Beckett was living in a long-term care unit with 24/7 nursing support, and he could ask for additional blankets or clothing as needed. (*Id.* at 8).

Beckett continued to contest the issue. For example, on October 17, 2016, Mr. Beckett asked a nurse about restoring his Z-Code status. The nurse noted that Mr. Beckett was seen each day ambulating independently, attending yard and physical therapy, and taking all his medications and meals in the dayroom. He showed a normal daily routine, except that his hands got cold and discolored at times. The nurse therefore found no basis for further intervention. (Doc. 96-1 at 1259). Beckett made similar requests to other staff, which were generally denied for the reasons previously explained. *See*, *e.g.*, (*id.* at 1261; Doc. 96-4 at 5-8, 14; Doc. 96-5 at 5-7). In response to a grievance about too cold temperatures in his cell, the temperature in Beckett's cell was measured between 70 and 72 degrees. *See* (Doc. 147-8 at 9). In the months that followed, Beckett was frequently observed ambulating outside of his cell in no apparent distress. *See*, *e.g.*, (Doc. 96-1 at 1108-1111, 1117-1122).

**D. SCI-Dallas (March 16, 2017 – September 28, 2020)**

On August 18, 2016, Beckett was transferred to SCI-Dallas for reasons that are not clear from the record.[7] The medical staff cleared him to possess winter clothes year-round due to his sensitivity to the cold. (Doc. 96-1 at 1093).

On June 12, 2018, Beckett was involved in a dispute regarding his entitlement to a cane, abdominal binder, and cervical collar; his grievance about the matter was upheld to the extent that the prison staff acknowledged these should be provided to him on a "permanent" basis for use "as needed." (Doc. 96-1 at 627-28; Doc. 96-7 at 5-6, 10). This appears to have resolved that dispute, and the items were renewed by the medical staff for the following year.[8] *See* (Doc. 96-1 at 615-622). However, Beckett's subsequent request for permission to shower in the

---

[7] The Medical Defendants refer to a memorandum noting that [Bureau of Health Care Services nurse] Carol Bowser "designated SCI-Dallas to be a more appropriate site for the level of care he required." (Doc. 96-1 at 909).

[8] There is also evidence that Beckett was granted Z-Code status for some time at SCI-Dallas. *See* (Doc. 96-1 at 336-337) (Beckett's October 14, 2020, complaint from SCI-Fayette that his "Z-Code . . . [was not] followed" as it was at SCI-Dallas); *but see* (*id.* at 909) (Z-Code status not listed among his "approved restrictions" as of April 4, 2020).

evening, on the basis that "showering in the morning does not help his pain," was denied. (*Id.* at 906-910).

**E. SCI-Fayette (September 28, 2020 – May 31, 2023[9])**

In August 2020, Beckett was diagnosed with non-Hodgkin's lymphoma. With Beckett's agreement, he was transferred to SCI-Fayette on September 28, 2020, for treatment. (Doc. 96-1 at 367-369, 415-418, 422). On October 14, 2020, at a sick call, he again complained that he was not afforded Z-Code status, but the medical staff told him that "oncology inmates" were housed in "regular 2-bedded cells": "[I]f this institution doesn't recognize [or] doesn't have a [Special Needs Unit] with single cell then we can't abide by what Dallas did for you." (*Id.* at 336-337). His cervical collar, cane, and abdominal binder were continually renewed. *See* (*id.* at 193-194, 215-218, 324).

Beckett's chemotherapy treatment concluded in January 2021 (*id.* at 289), but he stayed at SCI-Fayette for further medical care, including treatment for chemotherapy-induced pancreatitis, gastrointestinal issues and headaches. *See* (*id.* at 238-242, 275-283). Beckett does not

[9] The medical records designated with the Medical Defendants' motion end on May 31, 2023.

appear to assert any claim based on the treatment of these illnesses. At a psychiatry appointment on July 26, 2021, he indicated that his Z-Code status had been restored. (*Id.* at 243).

## IV. DISCUSSION

### A. Retaliation

Beckett asserts a First Amendment retaliation claim premised on an alleged retaliatory transfer. The Commonwealth Defendants have construed this claim as referring to his January 15, 2015, transfer from SCI-Huntington to SCI-Smithfield. They argue, correctly, that any such claim would be time-barred.

A Section 1983 claim must be filed within the limitation period for personal injury tort law in the state where the cause of action arose. *Wallace v. Kato*, 549 U.S. 384, 387 (2007). In Pennsylvania, a Section 1983 claim must be brought within two years. *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009) (citing 42 Pa. Cons. Stat. § 5524(2)). The two-year period begins "when the plaintiff knew or should have known of the injury upon which its action is based." *Kach*, 589 F.3d at 634 (citing *Sameric Corp. v. City of Philadelphia*, 142 F.3d 582, 599 (3d Cir. 1998)). Here, Beckett filed his initial complaint in February 2018 (Doc. 1), more

than three years after the January 2015 transfer. Even accounting for time spent exhausting administrative remedies, his claim is time-barred.[10]

We also construe Beckett as asserting a retaliation claim regarding his August 18, 2016, transfer from SCI-Smithfield to SCI-Laurel Highlands. *See* (Doc. 154 at 2). To state a prima facie case of First Amendment retaliation, a plaintiff must show that (1) he was engaged in constitutionally protected conduct, (2) he suffered an "adverse action" by prison officials sufficient to deter a person of ordinary firmness from exercising his First Amendment rights, and (3) the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take the adverse action. *Wisniewski v. Fisher*, 857 F.3d 152, 156 (3d Cir. 2017) (quoting *Newman v. Beard*, 617 F.3d 775, 781 (3d Cir. 2010)).

---

[10] Beckett's evidence would not have supported his theory that the January 2015 transfer was retaliatory. He appears to claim that defendants Bubb and Savino had him transferred from SCI-Huntingdon to SCI-Smithfield, a medically "inferior" prison. However, he has not identified evidence showing that either defendant was personally involved in the transfer. Moreover, the remarks that inmate Cooper ascribes to these defendants suggest, if anything, that they believed Beckett was better off for being transferred to SCI-Smithfield. *See* (Doc. 170-18) ("For now, he's good . . . He's not at Huntingdon.").

First, Beckett has not presented evidence showing that any of the remaining defendants[11] were personally involved in the decision to transfer him to SCI-Laurel Highlands. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs."). Moreover, the record indicates that the prison staff "would have made the same decision [to transfer Beckett] absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Rauser v. Horn*, 241 F.3d 330, 334 (3d Cir. 2001). Specifically, less than two weeks before the transfer, Beckett had explicitly requested "a medical and/or mental health transfer" to an "SNU or medical unit" based on his medical needs. The prison staff reviewed his circumstances and determined that a different prison would be more appropriate for his needs. Even if this could be construed as an "adverse action" because it resulted in the temporary loss of his Z-Code status, Beckett cannot claim that prison staff were retaliating against him by accommodating his own requests. *See*, *e.g.*, *Alexander v. Fritch*, 396 F. App'x 867, 871 (3d Cir. 2010) (where

[11] The record suggests that the individuals involved in this transfer were Dreibelbis, Dr. Frommer, and Kevin Kauffman, the former superintendent of SCI-Smithfield. *See* (Doc. 96-1 at 987).

defendants granted a plaintiff's requests to be transferred to a different unit, he could not sustain a retaliation claim on a theory that he received an "undesirable housing assignment").

**B. Conditions of Confinement**

The Eighth Amendment "prohibits any punishment which violates civilized standards and concepts of humanity and decency," including conditions that deprive prisoners of "the minimal civilized measure of life's necessities." *Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020) (quoting *Wilson v. Seiter*, 501 U.S. 294, 299 (1991)). The "benchmark" for unconstitutional conditions of confinement "is not that the inmate was merely uncomfortable; he or she must show they are 'incarcerated under conditions posing a substantial risk of serious harm.'" *Clark v. Coupe*, 55 F.4th 167, 179 (3d Cir. 2023). In addition, the prisoner must show that the prison official acted with deliberate indifference to the prisoner's health or safety. *Chavarriaga v. New Jersey Dep't of Corr.*, 806 F.3d 210, 226 (3d Cir. 2015) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Deliberate indifference means that the defendant "acted or failed to act despite having knowledge that her actions or inaction . . . would subject the inmate to a substantial risk of serious harm." *Id.* at 227.

By these standards, the Eighth Amendment does not entitle Beckett to choose exactly how his conditions are treated or accommodated.[12] For example, he had no constitutional right to leave the yard during "half-time movement" at SCI-Laurel Highlands, even though he asserted a medical reason for doing so. The alternative provided by defendant Grant — to opt in or out of yard time on a daily basis — preserved Beckett's rights to be free from outdoor conditions that created a risk of "serious harm" and to have occasional exercise or recreation. *See Gattis v. Phelps*, 344 F. App'x 801, 805 (3d Cir. 2009) (inmate's claim "that he was not guaranteed outdoor exercise at all times . . . was insufficiently serious to implicate the Eighth Amendment").

For similar reasons, Beckett cannot sustain an Eighth Amendment claim on a theory that his cells were too cold. There is no evidence that the temperature in his cells was ever below a standard indoor room temperature or that such a temperature created a "substantial risk of serious harm" to Beckett. Moreover, the record indicates that he was

[12] *See, e.g.*, *Payne v. Doe*, 636 F. App'x 120, 123-24 (3d Cir. 2016) (prisoner had no Eighth Amendment right to dictate the foods served to accommodate his allergies); *Thomas v. Pennsylvania Dep't of Corr.*, 615 F. Supp. 2d 411, 421-22 (W.D. Pa. 2009) (prisoner received crutches rather than a replacement prosthetic leg).

consistently offered access to blankets and winter clothes as needed. To the extent his claims are based on occasional exposure to "inclement weather," he has not presented any evidence that any defendant knowingly exposed him to outdoor conditions that posed a risk of serious harm, as opposed to occasional discomfort.[13]

Nor can Beckett sustain an Eighth Amendment claim based on the denial of Z-Code (single cell) status. Although he presented evidence of a potential justification for this status — that "individuals with CRPS have a compromised immune system" — various members of the prison medical staff disagreed with this reasoning and found that there was no medical need for Z-Code status. Although Beckett had been granted that status in the past, it was not deliberate indifference for those individuals to deny the accommodation based on their own medical judgment. *See, e.g.*, *DeFranco v. Wolfe*, 387 F. App'x 147, 158 (3d Cir. 2010) ("On one side we have some medical professionals stating that single-celling would be

---

[13] Even if Beckett's January 16, 2015, injury was attributed to "inclement weather," there is no evidence showing that any named defendant was personally involved in this incident, and any claim premised on a January 2015 injury would be time-barred. *See* § IV.A, *supra*.

ideal and that double-celling causes harm to DeFranco. On the other side we have some medical professionals stating that there is no harm . . . Because a mere disagreement of professional opinion among doctors does not mean deliberate indifference, this fails to create a genuine issue of material fact.").[14]

Beckett also claims the right to shower at a particular time of day; to visit a barber twice per week; to be restrained with leather straps rather than metal handcuffs; to be transferred back to SCI-Smithfield in a van, rather than a bus; and to receive "no transfers to noisy housing," among other accommodations. *See*, *e.g.*, (Doc. 22 at 7, Doc. 154 at 3). Although we acknowledge the evidence of Beckett's medical problems and the pain they have caused him, this does not create a constitutional right to every accommodation that would make him more comfortable, even if he received it in the past or someone else recommended it. *See*, *e.g.*, *DiFraia v. Ransom*, 171 F.4th 622, 629 (3d Cir. 2026) ("[I]t is not enough that a prisoner or another doctor would prefer a different approach than the one corrections officials took.").

---

[14] Beckett appears to assume that Z-Code status would have resulted in his receiving a warmer cell; even if that were true, that fact would not show a constitutional violation.

**C. Medical Needs**

Finally, the Third Circuit recognized a separate Eighth Amendment claim premised on allegations of inadequate medical care. *See* (Doc. 68-2 at 6-7). In this context, courts have found deliberate indifference when a prison official "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

The record shows that Beckett has received ample medical attention; beyond the accommodations referenced above, it is unclear what specific treatment he claims he was denied. In briefing, he alleges that defendants Dancha and Mihaly "often stated to [Beckett]: "We have never diagnosed, nor treated RSD! We do not know what to do for you. We'll just watch you and see what happens."[15] (Doc. 154 at 3). Beckett

[15] Beckett also presents evidence that his "DVA rating" is now 90%. This refers to a metric used by the Department of Veterans Affairs to calculate an individual's disability benefits. *See* (Doc. 170 at 31). Even assuming as true Beckett's allegation that he used to be at 60% (meaning that some of his conditions have worsened over time), he offers no evidence supporting his conclusion that this was caused by exposure to the cold, nor that it was attributable to deliberate indifference.

presents no evidence of these alleged remarks, and the record indicates that Dancha and Mihaly had only limited roles in his medical care. Regardless, the medical staff's purported inexperience and uncertainty in treating RSD — which is "little-known and often misunderstood" and lacks a specific method of treatment, *see* (Doc. 154-14 at 4-7) — does not equate to deliberate indifference. *See DiFraia*, 171 F.4th at 629 ("[P]risoners aren't constitutionally entitled to their preferred treatment plan or to medical care that is great, or even very good . . . [a]nd sometimes keeping an eye on a problem without doing more is a reasonable choice.") (quotation and citation omitted); *Jones v. Lopez*, 21 F. App'x 479, 480 (7th Cir. 2001) (affirming summary judgment on a claim premised on alleged failures in diagnosis and treatment of RSD).

## V. CONCLUSION

For the foregoing reasons, all defendants are entitled to summary judgment on Beckett's claims, and we need not address their remaining arguments. An appropriate order follows.

Dated: September 21, 2026

*s/Joseph F. Saporito, Jr.*
JOSEPH F. SAPORITO, JR.
United States District Judge